**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JUDY SHAHIN,

          *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

          *Defendant*.

_____/

CASE NO. 2:18-cv-12939

DISTRICT JUDGE PAUL D. BORMAN

MAGISTRATE JUDGE PATRICIA T. MORRIS

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 16 & 20)**

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 16), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 20), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Judy Shahin's claims for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* and Supplemental Security Income (SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f. (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D.

Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (R. 3). Currently before the court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 16, 20).

Plaintiff filed her applications for DIB and SSI on March 31, 2016. (R. 12 at PageID.47). She alleged that the disability for which she sought benefits began on March 3, 2016. (*Id.* At PageID.47, 253). Her claim was denied at the initial level on August 9, 2016. (*Id.* at PageID.47). At Plaintiff's request, a hearing was held on August 29, 2017, before an administrative law judge (ALJ). (*Id.* at PageID.47-62). On February 14, 2018, the ALJ issued a decision finding that Plaintiff was not disabled. (*Id.* at PageID.62). The Appeals Council denied her request for review. (*Id.*, PageID.38). This action followed. (R. 1).

## B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Social Security Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the

3

duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the

4

claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found that Plaintiff was not disabled. (*Id.* at PageID.50). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 3, 2016, the alleged onset date. (*Id.*). At step two, the ALJ determined that Plaintiff had the following medically determinable impairments: "bilateral C6 and S1 polyradiculopathy; bilateral knee osteoarthritis with May 2017 right degenerative meniscus tear; fibromyalgia; and seronegative arthritis." (*Id.*). With that said, at step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (*Id.* at PageID.53).

The ALJ then determined that Plaintiff had the RFC

[T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except in that the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. She can sit for 6 hours out of an 8-hour workday and can stand and/or walk for 4 hours out of an 8-hour workday. She must have the ability to alternate between sitting and standing, at her option, every 30 minutes for 1-2 minutes so long as she is not off task or has to leave the vicinity of the workstation. She must be able to use an assistive device to aid in ambulation if she has to walk more than 25 feet from the workstation. The claimant can never climb ladders, ropes, or scaffolds, kneel, or crawl and can occasionally climb ramps and stairs, balance, crouch, and stoop. She can never reach overhead with the bilateral upper extremities. She cannot turn her neck to the extreme ranges but can move her torso to accommodate this action. The claimant can only hold her neck in downward static position for periods of up to 5 minutes before having to move her head for several seconds. She can occasionally push and/or pull

operate foot controls with the bilateral lower extremities. She cannot walk on uneven terrain or work around unprotected heights or unprotected moving mechanical machinery. She cannot perform any commercial driving.

At step four, the ALJ found that Plaintiff was still able to perform her past work as a blow machine operator because that work does not require performance of work-related activities precluded by her RFC. (*Id*. at PageID.59). Thus, the ALJ found that she had not been under a disability since March 3, 2016, the alleged onset date. (*Id.* at PageID.61).

### E. Administrative Record

### 1. Medical Evidence

Per the medical record, Plaintiff was a 46-year-old woman who initially presented to Dr. Kenneth McNamee on April 2, 2015, with bilateral knee pain, which she had been experiencing for over six months. (R. 12 at PageID.349). The pain was not brought on by any specific event; it developed on its own. (*Id*.). Plaintiff described it as "constant, sharp, throbbing, knife-like pain[,] and on a scale of 1 to 10," her pain would be a 10. (*Id*.). Plaintiff had no known drug allergies. (*Id*.). She had a history of thyroid disease. (*Id*.). Plaintiff was a non-drinker but smoked every day. (*Id*.). Plaintiff also complained of morning stiffness, stiff back, stiff fingers, stiff neck, and stiff toes as well as headaches. (*Id*.). According to Dr. McNamee's physical exam, Plaintiff was well-developed, well-nourished, and exhibited no acute distress. (*Id*. at PageID.350). She was alert and oriented x 3, pleasant, and cooperative. (*Id*.). She walked without a limp and with normal gait. (*Id*.).

Regarding her lower right extremity, Plaintiff had a tenderness directly over the medial joint line of the knee and gave a positive McMurray test. (*Id*.).[1] There was a negative anterior drawer, pivot shift, and Lachman test. (*Id*.). Plaintiff showed full flexion of the knee, but the knee lacked complete extension secondary to pain. The patella tracked well, but the examining physician noted that there was still "some mild crepitus of the patellofemoral articulation." (*Id*.). Her medial and lateral collateral ligaments were functioning well and demonstrated "excellent stability." (*Id*.). Her posterior cruciate ligament was functioning well and likewise "demonstrate[d] excellent stability." (*Id*.). Plaintiff exhibited no skin lesions, varicosities, masses, rashes, ulcers or café-au-lait spots. (*Id*.). She showed no obvious signs for muscular atrophy; she had normal muscular tone, and there were now fasciculations or spasticity. (*Id*.). She had normal 4/4 popliteal, dorsalis pedis, or posterior tibial pulses. (*Id*.). She had no toe infections, petechiae, bunions, toe deformities, or calluses. (*Id*.). She had a full range of motion of her hip and ankle without crepitus or instability. (*Id*.). Finally, she had "good muscle strength 5/5 throughout the motor groups supplied by the lumbar and sacral plexus." (*Id*.).

Regarding lower left extremity, Plaintiff exhibited tenderness directly over the medial line of her knee. (*Id*.). There was a positive McMurray's test and negative anterior drawer, pivot shift, and Lachman tests. (*Id*.). There was full flexion of her knee, but the knee lacked full extension secondary to pain. (*Id*.). Her patella tracked well but exhibited

---

[1] A McMurray test is used by physical therapists to assess whether an individual has tears in the meniscus of the knee. Wayne Hing, et al., *Validity of the McMurray's test and Modified Versions of the Test: A Systematic Literature Review*, 17 J. Manual & Manipulative Therapy 22, 22 (2009).

"some mild crepitus of the patellofemoral articulation." (*Id*.). Her posterior cruciate ligament was functioning well and demonstrated "excellent stability." (*Id*.). She had no skin lesions, varicosities, masses, rashes, ulcers, or café-au-lait spots. (*Id*.). She had no obvious muscular atrophy, had normal muscular tone, and there were no fasciculations or spasticity. (*Id*.). She had normal 4/4 popliteal, dorsalis pedis, or posterior tibial pulses. (*Id*.). She had no toe infections, petechiae, bunions, toe deformities, or calluses present. (*Id*.). She had a full range of motion of her hip and ankle without crepitus or instability. (*Id*.). She had good muscle strength 5/5 throughout the motor groups supplied by the lumbar and sacral plexus. (*Id*.).

During this same visit to Dr. McNamee, blood pressure was not within the normal limits, nor was her Body Mass Index (BMI), thus, Dr. McNamee referred Plaintiff to her primary care physician for "further management." (*Id*.).

Plaintiff returned to Dr. McNamee on October 8, 2015, for a follow-up. (*Id*. at PageID.352). During the follow-up, Plaintiff's pain in her right knee was worse than that of her left, and on a scale of one to ten, her pain would have been an eight. (*Id*.). The MRI of her right knee showed a radial tear through the posterior root of the medial meniscus. (*Id*.). The MRI of her right knee also demonstrated primary osteoarthritis. (*Id*.). The MRI of her left knee showed a radial tear of the posterior horn and posterior root of her medial meniscus, primary osteoarthritis, and loose bodies. (*Id*.; *see also id.* at PageID.360-61 (MRI results)).

At the follow-up, Dr. McNamee assessed that Plaintiff had bilateral degenerative arthritis in her knees with her right knee being in more pain than her left. (*Id*. at

PageID.353). Dr. McNamee thus recommended arthroscopic intervention of her right knee. (*Id.*). After the subsequent right knee arthroscopy and medial and partial meniscectomy in October, (*id.* at PageID.358-59), Plaintiff's wounds "healed nicely," and there we no signs of infection, (*id.* at PageID.356-58). The stiffness and weakness was "as expected" post-surgery. (*Id.* at PageID.356).

Plaintiff also began visiting ProMedica Monroe Regional Hospital. (*Id.* at PageID.364-97). At a visit in August 2015, Plaintiff received treatment for chest pain. (*Id.* at PageID.374). In October 2015, Plaintiff received a microscopic analysis confirming the clinical diagnosis on her right knee. (*Id.* at PageID.386). Then, at a visit in November 2015, Plaintiff underwent a physical therapy session in which she had "good tolerance" for the treatment, which included several therapeutic exercises. (*Id.* at PageID.392). At a visit in April 2016, Plaintiff described her knee pain as "sharp and burning." (*Id.* at PageID.395). The record indicated that her condition was aggravated by bearing weight, walking, stairs, and sitting for prolonged periods. (*Id.*). Moreover, Plaintiff indicated that the pain in her knees prevented her from performing her daily activities and that her condition was progressively worsening. (*Id.*). During the physical examination, she had severe musculoskeletal tenderness in both knees over the medial lines and over the patellofemoral joints. (*Id.* at PageID.396). Additionally, she had "normal" gait, "normal" coordination, her mental status was "normal" (*i.e.*, not depressed or anxious), her senses were "normal," and although she had some minor swelling, almost all the testing on her lower extremities indicated that they were likewise "normal." (*Id.* at PageID.396). In Dr. Melonakos's assessment, Plaintiff had primary localized osteoarthritis of the knees. (*Id.* at PageID.397).

Furthermore, Dr. Melonakos determined that Plaintiff's condition had temporarily improved after her meniscectomy but her symptoms had since returned and that "further arthroscopic debridement in the face of existing osteoarthritis [would be] unlikely to result in [a] good outcome." (*Id.*). As such, Dr. Melonakos recommended weight reduction, use of autoinflammatory medicines, and physical therapy as treatment for Plaintiff's knee pain. (*Id.*).

Plaintiff received a consultative mental-status exam in July 2016. (*Id.* at PageID.403). She explained that she took medications for depression and anxiety, and that she had "some problems with memory," which she described as "fogginess." (*Id.* at PageID.402). As for her daily activities, she could dress and shower, help with "very light household chores," and drive short distances; she enjoyed spending time with family. (*Id.* at PageID.403). During the exam Plaintiff was "attentive, alert, in touch with reality and did not seem to be exaggerating or minimizing her symptoms." (*Id.*). Her stream of mental activity was described as "logical, spontaneous, [and] organized." (*Id.*). She had struggled with suicidal ideation once at age 21 after the death of her father, but otherwise denied ever being self-injurious. (*Id.*). She had no history of homicidal ideation, psychosis, paranoia or delusions. (*Id.*). Her mental health conditions were depression and anxiety. (*Id.*). She was diagnosed with an adjustment disorder, which could be improved with medication, and the psychologist noted that Plaintiff "should be able to do routine work related activities at a sustained pace." (*Id.* at PageID.404).

Plaintiff was then examined by Dr. Omar Ahmad in 2016 and 2017 for complaints of back pain, neck pain, numbness, (*Id.* at PageID.414-29). Dr. Omar performed

cardiovascular, chest, mental status, cranial nerve, motor, sensory, and coordination exams as well as depression screenings. (*Id*. at PageID.414-15). Plaintiff received Toradol and Zofran injections in her deltoid as well as a number of prescription medications. (*Id*. at PageID.415-29). Dr. Ahmad determined that Plaintiff had a normal nonenhanced MRI of her lumbar spine and probable cysts within the right kidney. (*Id*. at PageID.426-27). The first EMG report found "evidence of a mild chronic bilateral SI polyradiculpathy, without ongoing denervation." (*Id.* at PageID.450). Later EMG findings were that she had "mild chronic bilateral C6 polyradiculpathy, without ongoing denervation." (*Id*. at PageID.428). Through a needle examination of her muscles, it was determined that her left deltoid, left flexor capri radialis, left extensor digitorum communis, right deltoid, right triceps, and right flexor capri radialis muscles "showed decreased recruitment, increased motor unit amplitude, increased motor unit duration, and slightly increased polyphasic potentials" but that all her remaining muscles "showed no evidence of electrical instability." (*Id*.).

Also in 2016, Plaintiff saw Dr. Tanvir Qureshi for a social security determination of her range of motion in her joints. (*Id.* at PageID.409-13). Plaintiff's complaints were pain, numbness, tingling in both legs, constant soreness from walking, fibromyalgia, arthritis in the hips and back, anxiety, and depression. (*Id*. at PageID.411). Her mental status was alert, she appeared well-ground, and her build and nutrition were "well nourished." (*Id*. at PageID.412). Examinations of her head and neck, eyes, ENMT, chest and lung, cardiovascular health, abdomen, nerves, and lymphatic system yielded "normal" results. (*Id*. at PageID.412-13). An assessment of her musculoskeletal condition indicated

that her knee and hip function were limited, that she had abnormal gait, and that she needed an ambulatory aid. (*Id*. at PageID.413).

Plaintiff also visited a radiologist, who determined that her cardiac silhouette and pulmonary vasculature were within normal limits. (*Id*. at PageID.436). The radiologist also determined Plaintiff's condition was "compatible with hepatocellular disease, including hepatic steatosis." (*Id*. at PageID.437).

Per her physical therapist's notes, Plaintiff's knee pain began at a six out of ten and increased steadily to a nine as treatment went on, with worsening tingling and numbness in her feet and knees. (*Id*. at PageID.455-59). Plaintiff filled out a knee survey at a visit to ProMedica. (*Id*. at PageID.460). In this survey, she indicated that (1) her knee stiffness was "severe" when she first woke up in the morning; (2) that in the last week, her pain pivoting on her knee had been "moderate"; (3) that in the last week, the pain she experienced in straightening her knee fully was "moderate"; (4) that the pain she experienced going up or down stairs in the last week had been "severe"; and (5) that the pain she experienced standing upright in the last week had been "moderate." (*Id*.). Plaintiff's physical therapist noted that her pain was a nine or ten at worst and a five or six at best on a ten-point scale. (*Id*. at PageID.461). Her standing tolerance was 20 minutes at most, as were her walking and sitting tolerance. (*Id*.). She had sleep interruptions as well. (*Id*.). The treatment plan included superficial heat and ice, electrical stimulation, ultrasound, manual therapy, therapeutic exercise, aquatic training, gait training, neuromuscular re-education, and work conditioning. (*Id*. at PageID.461). The Plaintiff's prognosis was "good." (*Id*.).

12

In July 2017, Plaintiff visited Dr. Reinhold with complaints for flank pain. (*Id.* at PageID.472). At this visit, she tested negative for constitutional, neurological, and gastrointestinal problems, but positive for dysuria and flank pain with lower quadrant and suprapubic tenderness. (*Id.* at PageID.468). The same month, Plaintiff visited occupational therapist Denise Durell at the reference from her primary care physician, Dr. Poling. (*Id.* at PageID.507). In Durell's evaluation, Plaintiff completed 4 of 22 movements without pain. (*Id.*). Plaintiff's limitations included "pain with reaching to feet while sitting, rotate neck to right, touch chin to chest, extend neck, raise both arms overhear, touch back of neck with left hand, touch low back, touch mid-back, extend/flex trunk, trunk rotation to right/left, squat, stand to place right/left food on chair." (*Id.*). Durell administered a Manual Muscle Test to assess her muscle strength and determined that while Plaintiff's muscle strength was within the functional limits in her upper extremity, her lower extremities, hip flexors, and right knee showed lower strength. (*Id.* at PageID.508). In addition, Plaintiff had normal range of motion in her arms and legs. (*Id.*) For 5 reps, Plaintiff could lift 5 pounds from almost 2 feet off the floor to the waist, then from waist to the crown; she attempted to lift 10 pounds but said she could not complete it due to numb fingers and a burning back. (*Id.* at PageID.509). Plaintiff was able to carry a 5-pound load over 50 feet and did not attempt to carry a 10-pound load or to repeat more carrying because she had begun experiencing bilateral knee pain and burning in her lower back. (*Id.* at PageID.510). Plaintiff was able to complete a push/pull task using a sled with no wheels which required 28 pounds of push force and 30 pounds of pull force. (*Id.*). She could sit for 30 minutes and showed no outward signs of increased pain while sitting. (*Id.*). She could stand for 20

minutes and walk for approximately 3 1/2 minutes over a distance of 150 feet. (*Id*.). Durell summarized that Plaintiff was functioning at a "less than sedentary demand level," which apparently meant she was limited to "occasional lifting less than 10 lbs. with frequent lifting of less than negligible loads." (*Id*.).

On various occasions throughout 2015 to 2017, Plaintiff saw her primary care physician, Dr. Rodney Poling. (*Id*. at PageID.514-93). In December 2015, Dr. Poling reviewed her general history and complaints, noting that Plaintiff had "considerable mild cranial sacral dysfunction with pain in spasm with setting standing or doing any activity for more than a few moments." (*Id*. at PageID.586-87). In January 2016, Plaintiff followed up with Dr. Poling, who administered arthrocentesis with Decadron 4 mg and Macraine 10 mg, which the Plaintiff noted decreased her pain and increased her range of motion. (*Id*. at PageID.586). In March 2016, Dr. Poling reviewed Plaintiff's history and noted that Plaintiff had previously been on dexamethasone, but upon decreasing the dosage, she increased in mobility. (*Id*.). Reducing the dose helped alleviate her bilateral knee pain. (*Id*.). In April 2016, Dr. Poling noted that Plaintiff had complaints regarding the circulation of her upper and lower extremities and possible neuropathy of her upper and lower extremities, and thus ordered EMGs of her upper and lower extremities. (*Id*.). In the May 2016 follow up appointment, Dr. Poling performed arthrocentesis in Plaintiff's right knee with Decadron and Marcaine. (*Id*.).

In June 2016, Dr. Poling noted Plaintiff complained of pain in her lower back, which caused sacral torsion and share and "affects the left cervical vertebrae to move posteriorly and the right C2 vertebrae to move posteriorly[,] [c]ausing a twisting affect in the cervical

14

region therefore making her cranial sacrum mechanism dysfunctional and increase this pain

through the entire mechanism." (*Id*.). Plaintiff also had tenderness in her right hip, for

which Dr. Poling recommended a therapeutic massage on the right sacroiliac joint area.

(*Id*.). In July 2016, Dr. Poling reviewed Plaintiff's recent mammogram showing fibrocystic

breast disease. (*Id*. at PageID.585).

In August 2016, Dr. Poling noted that Plaintiff's cranial sacral dysfunction

persisted, along with continued pain in her knees. (*Id*.). Her diet was "not fulfilling her

physiological needs," and Dr. Poling recommended Plaintiff increase intake of omega-3

fatty acids and decrease her intake of omega-3 6 fatty acids, which he posited increased

her pain. (*Id*.). Dr. Poling also recommended Plaintiff increase her fluid intake to alleviate

her dehydration. (*Id*.). Plaintiff told Dr. Poling she "wished she were dead," and Dr. Poling

advised her to seek counseling. (*Id*.).

In September 2016, Dr. Poling noted that Plaintiff was seeing Dr. Melonakos, that

she had several cervical osteopathic and sacroiliac lesions, that her sacroiliac joints were

bilaterally hypermobile, and that there was "compensatory rotoscoliosis with tissue tone

and texture changes throughout the cranial sacral mechanism." (*Id*.). Her vertebrae were

rotated, which caused Plaintiff "exquisite pain." (*Id*.).

In October 2016, Dr. Poling noted osteopathic lesions and bilateral knee and back

pain. (*Id*.). In November 2016, Dr. Poling recorded that Plaintiff was in back and bilateral

pain and "torsion of the sacrum when standing and bending forward." (*Id*.). Upon applying

the recommended therapeutic massage 30 minutes each day, this torsion was relieved, and

Dr. Poling noted that consistent application of this remedy could prevent the torsion from

15

developing into a degenerative disc disease that would require surgery. (*Id.*). During this appointment, Plaintiff complained of a panic attack and insomnia, for which Dr. Poling advised her to have blood tests to measure her dopamine, serotonin, and GABA brain chemicals. (*Id.*). In December 2016, Dr. Poling noted that Plaintiff's recent EMG report revealed chronic S1 polyradiculopathy. (*Id.* at PageID.584). Plaintiff had "motor weakness in her left gluteal medius, left gastroc, right gluteus medius, and rate gastroc anemias muscles which demonstrated decreased recruitment and increased motor unit amplitude with increased motor unit duration and slightly increased polyphasic potentials." (*Id.*). Plaintiff was also seeing a neurologist at the time. (*Id.*). She was deficient in vitamin D and had multiple osteopathic lesions in her cranial sacral mechanism. (*Id.*). To treat the resulting pain, Dr. Poling performed a myofascial release and cranial sacral maneuvers. (*Id.*).

In January 2017, Dr. Poling noted that the discrepancy in blood pressure between the Plaintiff's right and left arms may have been compatible with endothelial dysfunction, and that there were blood markers available to quantitate the discrepancy, but that her insurance would not cover it during that visit. (*Id.*). Many of the symptoms recorded in her December appointment persisted and still caused her substantial pain. (*Id.*). Dr. Poling advised Plaintiff to increase her iodine intake. (*Id.*).

In February 2017, Dr. Poling noted that Plaintiff's recent ultrasound revealed hepatocellular disease in her gallbladder. (*Id.* at PageID.575). Her blood lipids panel was normal at 58. (*Id.*). In the physical examination, Plaintiff exhibited similar symptoms of relating to cranial sacral dysfunction as she had in the previous two months, which were

16

alleviated by the recommended therapeutic massage. (*Id.*). Dr. Poling advised Plaintiff to adhere to a vegetarian diet and attend a facility with a swelling pool so she could "walk in the shallow end of the water or at least waist high and do laps for her exercise to help b[u]oy her up so that the knees will not be being aggravated by pain" five days a week. (*Id.*).

In March 2017, Dr. Poling noted that Plaintiff continued to complain of severe, dull, constant pain in her neck and back. (*Id.*). Plaintiff had seen a pulmonologist for sleep apnea. (*Id.*). Doctor Poling advised Plaintiff to increase 999 omega-3 noninflammatory fatty acids and to utilize organic apple cider vinegar. (*Id.*). In April 2017, Plaintiff complained of considerable musculoskeletal pain. (*Id.* at PageID.546). Dr. Poling recommended Plaintiff get therapeutic massage once again to alleviate the sacral torsion and shear. (*Id.*).

In June 2017, Dr. Poling indicated that Plaintiff had been to a rheumatologist, who suggested that Plaintiff may have autoimmune issues, including rheumatoid arthritis and "perhaps even Sjogren syndrome." (*Id.* at PageID.529). Plaintiff complained of "sharp, dull, throbbing, stabbing, and burning constant pain" in her "back, knee, and all over." (*Id.*). Her pain was 10/10 at worst and 3/10 at best. (*Id.*). Dr. Poling performed a modified high-density low amplitude OMT with myofascial release, to which Plaintiff responded favorably. (*Id.*) Also in June 2017, Plaintiff visited Dr. Malini Venkatram, a rheumatologist to whom Dr. Poling referred Plaintiff for arthritis. (*Id.* at PageID.593). During this visit, Dr. Venkatram resolved to start Plaintiff on Plaquenil q and to complete an inflammatory arthritis workup. (*Id.* at PageID.594).

17

In July 2017, Dr. Poling noted Plaintiff still had sacral torsion. (*Id*. at PageID.515). She still had multiple osteopathic lesions and hypermobile bilateral sacroiliac joints. (*Id*.). Dr. Poling reviewed Plaintiff's bloodwork. (*Id*.). In August 2017, Dr. Poling reviewed Plaintiff's test results and advised that she "get a therapeutic blood level of her vitamin D3 25-hydroxy levels compatible with the Harvard Medical Center range of 75-100 grams from milliliter," to go on a Mediterranean diet and consume Garcinia Cambogia for weight reduction. (*Id*. at PageID.514). Dr. Poling also advised that Plaintiff abstain from marijuana containing THC and instead use CBD, which "is very effective in reducing pain." (*Id*.).

Plaintiff's cited ailments were, *inter alia*, backache, anxiety, thigh pain, sprain of sacroiliac region, lower back pain, bilateral knee pain, fibromyositis, panic disorder with agoraphobia, extreme obesity with alveolar hypoventilation, and nonallopathic lesion of the lumbar and cervical regions. (*Id*. at PageID.516-17).

Finally, the MRI lab results ordered by Dr. Melonakos indicated that (1) the lateral meniscus was intact, but that there was "complex degenerative type tearing of the medial meniscus with near complete maceration" with advanced medial osteoarthritis; (2) a partial tear "involving the anterior cruciate ligament without full-thickness ligament tear"; (3) a "small osteochondral lesion medial femoral condyle without evidence of fragment instability;" (4) mild to moderate "lateral and patellofemoral compartment chondromalacia;" and (5) "large suprapatellar joint effusion." (*Id*. at PageID.617-18).

## 2.   Application Reports and Administrative Hearing

### i.   Plaintiff's Function Report

Plaintiff completed a function report as part of her application for benefits. (R. 12 at PageID.316-23). She explained that her ability to work was constrained because she had limited mobility from pain in her knees, a stiff and weak right hand, pain all over her body, depression, anxiety, fatigue causing multiple naps, memory and concentration issues caused by her medications, and panic attacks. (*Id.* at PageID.316). On a typical day, Plaintiff woke up, ate, took her medications, took several naps, and watched television. (*Id.* at PageID.317). She had several panic attacks each week. (*Id.*) Some of her medications and treatments caused side effects: Norco affected her memory and caused fatigue, while Effexor affected her ability to concentrate. (*Id.*). Sometimes she forgot whether she had taken her medications. (*Id.* at PageID.210).

She had some issues with personal care, which took her a long time to complete. (*Id.* at PageID.317). Because she fell in the shower twice, Plaintiff had to sit in the shower to bathe, but she did not expressly comment on her ability to shave, care for her own hair, dress herself, use the toilet, and feed herself, and she needed no reminders to attend to her personal needs. (*Id.* at PageID.317-18). Plaintiff typically prepared her own food daily and usually spent between five and ten minutes making herself simple meals or sandwiches. (*Id.* at PageID.318.). The primary change in her cooking habits since onset was that she could no longer cook big meals for herself, but she did not elaborate on why she could not do so. (*Id.*).

19

Plaintiff did no household chores. (*Id.*). She was not able to do house or yard work. (*Id.* at PageID.319).

Plaintiff did not go outside often, and only did so if weather permitted. (*Id.*) When she did go out, she would either ride in a car or drive, which she could do by herself for short distances. (*Id.*). To get to doctor appointments, Plaintiff drove herself and did not need any assistance or reminders to so. (*Id.*). Her family did all her shopping for her. (*Id.*). She remained able to handle money, including counting change, paying bills, handling a savings account, and using a checkbook. (*Id.*). Her hobby was watching television, which she did daily. (*Id.* at PageID.320). She socialized only with her family, but did so daily. (*Id.*). She expressed that she did not "like to be around anyone" because she had frequent panic attacks and anxiety. (*Id.* at PageID.321).

Her impairments affected her ability to get along with others, concentrate, lift, squat, bend, reach, stand, walk, sit, kneel, climb stairs, complete tasks, understand, follow instructions, and use her hands, as well as her memory. (*Id.*). She explained that after walking half a block, she would have to rest. (*Id.*).

Plaintiff could pay attention for 15 or 20 minutes and indicated that she did not finish tasks she had started (*Id.*). She could not follow written or spoken instructions well. (*Id.*). She did not get along with or like authority figures, and she had been fired from a previous job for failing to get along with her coworkers. (*Id.* at PageID.322). She did not handle stress or changes in routine well. (*Id.*) She had noticed that she feels fear and has frequent panic attacks because of her anxiety. (*Id.*). Plaintiff was prescribed a cane in April

2016, which she used when leaving the house. (*Id*.). She takes Norco, Mobic, and Effexor. (*Id*. at PageID.323).

### ii.  The Administrative Hearing

### a.  Plaintiff's Testimony

Plaintiff testified at the administrative hearing on September 29, 2017. (R. 12 at PageID.69-113). At the time, Plaintiff was living with her mother and sister, who paid the household bills. (*Id.* at PageID.76). She testified that she still had a driver's license and did not have any problems or restrictions driving by herself. (*Id.* at PageID.75). She had not worked since March 3, 2016, the date of the alleged onset of her disability. (*Id.*). Plaintiff explained that she had been working for a year and a half with pain and had been put on steroids, which caused weight gain. (*Id*. at PageID76). She explained further that upon getting home from work, these steroids made her feel paralyzed to the point of soiling herself. (*Id*.). Consequently, Plaintiff decided to stop taking the steroids altogether and quit her job. (*Id*.).

Plaintiff's last job had been at Trinity Continuing Care, where she worked as a cook. (*Id*. at PageID77). During her work as a cook, she lifted plates, dishes, silverware, pots and pans, sugar, and kitchen inventory. (*Id*.). Plaintiff explained that up to one-third of the day she lifted between 35 and 50 pounds. (*Id*. at PageID78).

Next, Plaintiff explained her self-employment status from 2013 to 2015. (*Id.* at PageID.79). During this time, Plaintiff owned Fred's Cash and Carry, a party store. (*Id*.). She had worked at the store between 40 and 60 hours a week running the cash register, filling coolers, lifting beer cases, cleaning, and making subs. (*Id*. at PageID.80). She was

21

the only employee at the party store and worked seven days a week. (*Id*. at PageID.80-81). During her time working at the party store, Plaintiff lifted between 20 and 30 pounds for one third of each day. (*Id*. at PageID.81).

Plaintiff went on to explain her work as an operator at JCI, a blow molding facility for car parts. (*Id*. at PageID.82-84). Her work at JCI entailed trimming car parts and adding pins as needed as part of an "assembly line" of workers at different stations. (*Id*. at PageID.82-83). For this job, Plaintiff lifted up to 50 pounds. (*Id*. at PageID.84). Plaintiff also worked at Panera briefly in 2004. (*Id*.).

After discussing her previous job positions, Plaintiff described her ailments to the ALJ. (*Id*. at PageID.86-111). First, Plaintiff explained that she had chronic pain in her central lower back that extended through her buttocks and thighs. (*Id*. at PageID.87). The pain in her back was constant, while the pain in her buttocks and thighs was sporadic and seemed to depend on how much she had done that day. (*Id*.). She indicated that she took medications for this that temporarily provided her some relief from the pain. (*Id*.).

Next, Plaintiff described the pain she experienced from her neck "through the middle of my shoulders," which her doctors attributed to a pinched nerve in her neck. (*Id*. at PageID.88). Because of this ailment, Plaintiff had limited mobility in her neck, got "bad headaches from it a lot," and became lightheaded if she looked down. (*Id*.). Plaintiff explained that although doctors had recommended occupational and physical therapy to help with her ailments, she refused because she felt that her past attempts at therapy did

not help her.[2] (*Id*.). She experienced some tingling and burning in her legs that her neurologist attributed to a disk disease in her lower back. (*Id*. at PageID.89).

Plaintiff saw a rheumatologist a few months prior to the hearing and was diagnosed with rheumatoid arthritis, osteoarthritis, and fibromyalgia. (*Id*. at PageID.89-90). Plaintiff said she was prescribed a medication, the name of which she could not recall, but otherwise was not treated by the rheumatologist for her conditions.

Plaintiff also saw an orthopedic doctor for pain in her knees. (*Id*. at PageID.92). The doctor drained fluid from her knees, gave her shots in her knees, but told her to hold off on surgery for a few years because she was relatively young and her condition was "not quite bone on bone yet." (*Id*.).

Plaintiff indicated that she is generally unable to do much around the house and watched television and rested most days. (*Id*. at PageID.92-93). She walked with a cane because her right knee was worse than her left and she had bursitis in her hips. (*Id*. at PageID.96). Plaintiff could stand and walk for 10 to 15 minutes. (*Id*.). Without the cane, she could walk only about 20 to 25 feet. (*Id.* at PageID.103.) She could comfortably sit for about 30 minutes. (*Id*. at PageID.97). She could lift and carry about five pounds. (*Id*.). In addition to her listed medications, Plaintiff took Vitamin D, Librium, and Prilosec. (*Id*.). Plaintiff was prescribed Librium by Dr. Polling, her primary care physician, and she only took it as needed because for panic attacks. (*Id*.).

---

[2] Plaintiff explained to the ALJ that she did not feel like physical therapy helped her and posited that it made her conditions worse. She said after attending therapy sessions, her legs would go numb and subsequently begin burning and tingling. She felt paralyzed by this sensation and she was still having this problem. (*Id.* at PageID.89).

On the topic of these anxiety attacks, Plaintiff expressed to the ALJ that she had had anxiety attacks since age 21 and that the attacks occurred more frequently when she was around people. (*Id*. at PageID.98). She was not, however, receiving counseling. (*Id.* at PageID.97.)

Plaintiff testified that when she drove, she would not drive far—she could last only about two to five minutes—because driving farther was too painful. (*Id*. at PageID.99). Her legs and feet would become numb from driving long distances as well. (*Id*.).

Lastly, Plaintiff testified she occasionally fell and had fallen in the shower twice. (*Id*. at PageID.99-100). She had been using a shower chair for about six months prior to the hearing to assist in her bathing. (*Id*.). She napped about four or five times a day. (*Id*. at PageID.101).

### b.  The Vocational Expert's Testimony

Vocational Expert (VE) Mitch Norman also testified. (*Id.* at PageID.101-11). The ALJ confirmed that the exertional levels of Plaintiff's past several jobs were light to medium. (*Id*.).

The ALJ presented the VE with a hypothetical roughly describing Plaintiff's predicament:

> Consider a hypothetical individual who can perform less than a full range of light work and that this person can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; sit for six hours of an eight-hour workday and stand and/or walk for four hours out of an eight-hour work day. This person must have the ability to alternate between sitting and standing at their option every 30 minutes, so long as they are not off task or has to leave the vicinity of the workstation. This individual must be able to use an assistive device to aid in ambulation, if the individual has to walk more than 25 feet from the workstation. This individual can never climb ladders, ropes or scaffolds, kneel or crawl, and could occasionally climb ramps and

24

stairs, balance, crouch and stoop. This individual can never reach overhead with the bilateral upper extremities. This individual can occasionally push and/or pull or operate foot controls with the bilateral lower extremities. This individual cannot move—cannot turn their head to extreme ranges of motion, but can move their torso to accommodate this action. This individual can only hold their neck in a downward static position for a period of up to five minutes before having to move their head for several seconds. This individual cannot walk on uneven terrain or work around unprotected heights or unprotected moving mechanical machinery. This individual cannot perform any commercial driving and I think I had the foot controls, correct; could only occasionally push and/or pull or operate foot controls with the bilateral lower extremities.

(*Id.* at PageID.106-07). Although the VE posited that working as a party store clerk is generally light work, this work would probably be beyond the demands of the hypothetical describing the Plaintiff. (*Id.* at PageID.108). The ALJ then presented the VE with the same hypothetical and asked if a person described in the hypothetical could perform the position of blow molding machine operator, to which the VE replied that an individual with the hypothetical limitations presented should be able to perform the position of blow molding machine operator. (*Id.*). When asked if there were other jobs an individual with the limitations contained in the hypothetical could perform, the VE replied that this individual could perform in the positions of weld inspector, inspector of plastic products, and assembler of plastic hospital products. (*Id.* at PageID.108-09). Regarding demand in the workforce for these jobs, the VE posited that there are approximately 125,000 weld inspector position, 430,000 positions for inspector of plastic products, and 150,000 positions for assemblers of plastic hospital products. (*Id.*).

The ALJ presented a second hypothetical, similar to the first, but adding the following limitations: a sedentary exertion level; lifting, pushing, pulling, and carrying 10

25

pounds occasionally and less than 10 pounds frequently; and standing or walking for 2 hours during a 6-hour work day. (*Id*. at PageID.109). Under these limitations, the VE noted, an individual could not perform Plaintiff's past work but could perform the vocations of order clerk at the sedentary level (248,000 positions), bonding machine at the sedentary level (1100 positions), and PC board assembler at the sedentary level (115,000 positions). (*Id*. at PageID.109-10).

The ALJ presented a third hypothetical, like the first and second, but adding that this hypothetical individual could "understand, remember, and carry out simple routine tasks, make judgments in simple work and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few unexpected changes." (*Id*. at PageID.110). Additionally, the "individual can have occasional interactions with the general public, supervisors, and coworkers." (*Id*.). The VE responded that an individual with the limitations contained in this third hypothetical would not be able to work as a blow-machine operator or an order clerk at the sedentary level. (*Id*.). An individual with these limitations could, however, perform in the position of a document preparer, of which there were 180,000 positions. (*Id*.).

An individual with any of the hypothetical limitations could perform most of the aforementioned vocations with reasonable breaks in the shifts. (*Id*. at PageID.111). In sum, under each of the three hypotheticals the ALJ presented to the VE, the VE was able to articulate at least three jobs. (*Id*.).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations applicable to this case carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017).[3] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources

---

[3] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. §§ 404.1513 and 416.913 were updated as of March 27, 2017. The new regulation are effective for cases filed on or after March 27, 2017; because Plaintiff filed for DIB in 2016, I consider her case under the old rule.

In addition, various amendments to the regulations came into effect on March 27, 2017. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017). The new regulations, however, apply the old framework to claims like Plaintiff's filed before the effective date. 20 C.F.R. § 404.1527. But the attempt to preserve the prior structure is not altogether successful because the regulation containing that structure, 20 C.F.R. § 404.1527, references terms like "acceptable medical source" that were defined in the old regulations but are nowhere retained in the current regulations. Thus, I will refer to the old regulations as necessary. Many courts do the same. See, e.g., *Rodriguez v. Colvin*, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, 2018 WL 400772, at *1 (E.D.N.Y. 2018) (same))); *Woodall v. Berryhill*, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018).

issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c), 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011). The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a); 16-3p, 2016 WL 1119029, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. §§ 404.1529, 416.929 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he

or she is] disabled." 20 C.F.R. § 404.1529(a), 416.929(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

    (i)     [D]aily activities;
    (ii)    The location, duration, frequency, and intensity of . . . pain;
    (iii)   Precipitating and aggravating factors;
    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)    Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)   Any measure . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 16-3p, 2016 WL 1119029, at *7.

**G. Analysis**

Plaintiff makes two arguments: first, that the ALJ's analysis of the nature of fibromyalgia relied on objective rather than subjective evidence and thus was unsupported by substantial evidence; and second, that the ALJ's analysis of Plaintiff's mental impairments was incomplete and therefore unsupported by substantial evidence. (R. 16). I will address each argument in turn.

**1.    Objective Evidence of Fibromyalgia**

Plaintiff alleges that the ALJ's analysis of fibromyalgia relied too heavily on objective evidence and devoted insufficient weight to subjective evidence. (R. 16 at PageID.642). As Plaintiff observes, it is very difficult to "produce objective medical evidence that shows the degree to which fibromyalgia limits the functioning of the victim," (*id.* at PageID.643 (*quoting Laxton v. Astrue*, No. 3:09–CV–49, 2010 WL 925791 *6 (E.D. Tenn. 2010))), and the Sixth Circuit has clarified this point. The Sixth Circuit has previously held that an ALJ's failure to state reasons for disregarding physician testimony

30

or the plaintiff's subjective complaints of pain rendered a decision by an ALJ unsupported by substantial evidence. *Kalmbach v. Comm'r of Social Sec.*, 409 F. App'x. 8522011 WL 63602 (6th Cir. 2011); *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234 (6th Cir. 2007).[4]

Defendant responds that although objective medical findings generally should not be overly emphasized in an ALJ's determination at step two of whether fibromyalgia poses a severe impairment to a claimant, objective evidence is nevertheless an appropriate factor in an ALJ's evaluation of fibromyalgia's impact on Plaintiff's ability to work. (R. 20 at PageID.669-70). Defendant further contends that "a diagnosis of fibromyalgia does not automatically entitle [plaintiff] to receive disability benefits." (*Id*. at PageID.670). Moreover, Defendant notes that the role of objective evidence in an ALJ's step two evaluation is not at issue in this case because the ALJ had concluded at step two that fibromyalgia constituted a severe impairment. (*Id*. at PageID.671). Per the framework for social security benefits, the fact that an impairment itself is severe is not sufficient to conclude that an individual is incapable of working, which is a leap that Plaintiff appears to make. As the Sixth Circuit has held, "a diagnosis of fibromyalgia does not automatically entitle [a plaintiff] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Sarchet v. Chater*, 78 F.3d 305, 306-7 (7th Cir. 1996)) (R. 20 at PageID.670).

---

[4] In both of these cases, the ALJ either exclusively relied on objective evidence or neglected to state rationale for not giving the plaintiff's subjective evidence more weight. The 6th Circuit held in both instances that the ALJ's findings were not supported by substantial evidence for that reason.

Plaintiff here attacks the ALJ's RFC designation, but her argument that fibromyalgia is a severe impairment conflates the step-two determination and the RFC analysis. (R. 16 at PageID.642-47). In the past, however, the Sixth Circuit and Eastern District of Michigan have rejected arguments regarding objective evidence that "ignore[s] an important distinction between, on the one hand, diagnosing fibromyalgia and finding it to be a severe impairment and, on the other, assessing a claimant's physical limitations due to the impairment." *Torres v. Comm'r of Soc. Sec.,* 490 F. App'x 748, 754 (6th Cir. 2012); *accord Cooper v. Comm'r of Soc. Sec.,* No. 4:13-cv-11883, 2014 WL 4606010 at *19 (E.D. Mich. June 17, 2014) ("[T]here is a significant distinction between failing to find a severe impairment in step two and failing to find disability at step five.") (citing cases), *rep. & rec. adopted by* 2014 WL 4607960 (E.D. Mich. Sept. 15, 2014). Here, Plaintiff seems to rely on these cases to claim that the fact that her impairment was in itself severe necessarily precluded her from all work.

As Defendant notes, the ALJ ultimately did find Plaintiff's fibromyalgia to be a severe impairment and that Plaintiff satisfied this criteria because she had been diagnosed with fibromyalgia due to chronic pain in her neck, lower back, and legs, exhibited symptoms of at least six fibromyalgia symptoms (depression, anxiety, obesity, muscle weakness, numbness or tingling, and headaches), (R. 20 at PageID.671) (R. 12 at PageID.53); consistent with fibromyalgia, Plaintiff's physician found a number of trigger points for pain, and Plaintiff participated in testing to consider other causes to her pain (R. 12 at PageID.593-97).

In any event, I disagree with Plaintiff's claim that the ALJ primarily considered objective medical reports and neglected subjective evidence in making the determination. (R. 16 at PageID.642). The ALJ's decision properly considered Plaintiff's testimony in her evaluation of Plaintiff's conditions, devoting roughly the same amount of the decision to consideration of Plaintiff's testimony at her hearing as she did the objective medical evidence. (R. 12 at PageID54-55). The ALJ noted, regarding Plaintiff's subjective testimony at the hearing, that she found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id*. at PageID.55). The ALJ pointed to several specific inconsistencies between Plaintiff's subjective testimony and the objective medical evidence (*Id*. at PageID.55-57). First, the ALJ observed that although Plaintiff was prescribed medication to treat her rheumatoid arthritis, Plaintiff neglected to take this medication out of fear of potential side effects. (*Id*. at PageID.55). Second, while Plaintiff had testified that she was unable to perform most tasks, she conceded that she could "sweep a small area, cook simple meals, and drive short distances," walk to a nearby store to purchase small items, and would eat out at restaurants with her mother and sisters. (*Id*.). These inconsistencies tainted the credibility of the subjective evidence. Additionally, the ALJ opined that while Plaintiff was not symptom-free, the objective evidence did not support the claim that Plaintiff's ailments reached a level of severity that would preclude Plaintiff from performing all work. (*Id*. at PageID.58). In her determination, the ALJ

33

considered records and testimony from the following sources: Dr. Kenneth J. McNamee, Dr. Rodney H. Poling, Promedica Physicians Group Monroe, Promedica Monroe Regional Hospital, Sierra Medical Group, Dr. Tanvir Iqbal, Denise Durell, and Plaintiff's own testimony. (R. 12 at PageID.54-57). In sum, the ALJ met the standard of substantial evidence.

Plaintiff also argues that the ALJ gave insufficient weight to the evidence presented by Plaintiff's consulting occupational therapist, Denise Durell. (R. 16 at PageID.644-45). Durell had concluded that Plaintiff was "capable of performing less than sedentary exertional level work." (R. 12 at PageID.57). The ALJ, however, sufficiently justified the weight she gave Durell's evidence. She noted, for example, that Plaintiff did not complete the majority of testing required: the ALJ noted that Plaintiff "ceased most testing due to reports of alleged pain and declined to complete other tasks, including tasks such as a manual dexterity and an eye-hand coordination assessment." (*Id*.). The ALJ noted that there was "no reliability or validity testing provided with this assessment" and that Durell, an occupational therapist, is not considered an "acceptable medical source." (*Id*.). Per 20 CFR § 404.1527(f), the Social Security Administration outlines acceptable medical sources: "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case." The second subsection of this regulation stipulates that and adjudicator "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to

follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id*. In this case, the ALJ sufficiently articulated her rationale for the weight given to Durell's report of Plaintiff's condition (R. 12 at PageID.57); thus, I am not persuaded that the ALJ improperly neglected this evidence in her determination.

In conclusion, for the stated reasons, I find that the ALJ did not unduly consider objective evidence and properly considered subjective evidence in her determination, ultimately rendering her decision supported by substantial evidence.[5]

### 2. Impact of Plaintiff's Mental Impairments on her Ability to Work

Next, I turn to Plaintiff's second argument: that the ALJ's evaluation of Plaintiff's mental impairments was improper. (R. 16 at PageID.648). Plaintiff argues specifically that the ALJ neither properly considered the examination by Julia A. Czarnecki, M.A., L.L.P. nor the evaluation by the State agency psychological consultant. (*Id*.). As the ALJ noted, Plaintiff's mental health impairments were mild to moderate; she barely obtained mental health services for most of the relevant time period (besides taking antidepressants), and her impairments never rose to the level requiring intensive treatment or inpatient mental healthcare. (R. 12 at PageID.51).

---

[5] Defendant offers an alternative argument in its Motion for Summary Judgment in addition to those discussed above. Defendant argues that the limitations Plaintiff described in her hearing were the result of alleged knee and back pain rather than fibromyalgia, implying that these limitations are therefore irrelevant to Plaintiff's claim that the ALJ impermissibly evaluated her Fibromyalgia. (R. 20 at PageID.674-75). Defendant cited part of the hearing in which Plaintiff describes her physical limitations due to her pain. (R. 12 at PageID.96-97). But upon review, there is no indication in the record that Plaintiff distinguishes the pain in her knees and back as something separate from, as opposed to a symptom of, fibromyalgia. Because it would be improper for the Court to diagnose Plaintiff by deciding whether these symptoms are symptoms of fibromyalgia or not, the Court disregards this alternative argument.

In her determination, the ALJ discussed the consultative psychological examination performed by Julia Czarnecki and signed by Herman J. Daldin, Ph.D. (*Id*.). Plaintiff's chief complaint about the ALJ's discussion of the examination is that the ALJ did not give enough weight to Czarnecki's determination that Plaintiff would be limited to "routine-work-related activities." (R. 16 at PageID.648). With this criticism of the ALJ's analysis of the examination, Plaintiff cherry-picks a small section of Czarnecki's findings—a section also addressed by the ALJ—and overlooks all the others. (R. 12 at PageID.51). But the rest of the findings were largely normal. In the examination Czarnecki concluded that Plaintiff was attentive, alert, cooperative, and in touch with reality; Plaintiff's primary complaint was of chronic pain, which she attributed to her fibromyalgia. (*Id*.) (R. 16 at PageID.403). This examination also indicated little or no limitations in Plaintiff's memory, concentration, or understanding. (*Id*.). Czarnecki concluded that although Plaintiff had an adjustment disorder, this disorder had improved with medication. (R. 16 at PageID.404). Moreover, although Plaintiff appeared to have mild anxiety, she did not present with substantial problems in the realms of working, memory, or concentration. (*Id*.). Finally, as the ALJ noted,  Czarnecki concluded Plaintiff was "generally independent with her activities of daily living, gets along appropriately with others, and should be able to perform routine work-related activities at a sustained pace." (R. 12 at PageID.51) (R. 16 at PageID.404).

The ALJ examined this evidence of relatively normal mental-health functioning, finding it more compelling than Czarnecki's routine-work limitation. In doing so, the ALJ satisfied 20 CFR § 404.1527(f)(2) by properly articulating her rationale for giving

Czarnecki's assessment less weight, namely that the routine-work finding was unsupported by specific analysis. (R. 12 at PageID.51).Thus, I am unconvinced by Plaintiff's argument that the ALJ improperly evaluated the evidence of Czarnecki's mental examination of Plaintiff.

Plaintiff correctly observes that the ALJ assigned little weight to the assessment by the State agency psychological consultant, who had determined that Plaintiff was capable of performing simple work. (R. 16 at PageID.649); (R. 12 at PageID.51). The ALJ explained her rationale for doing so: "This assessment is not consistent with the medical evidence, reflecting very limited medication treatment and is also not consistent with the consultative examination, which found [Plaintiff] had no significant limitations with regard to memory, concentration, or understanding." (*Id.* at PageID.51). I am therefore unpersuaded by the notion that the ALJ improperly evaluated the evidence of Plaintiff's mental impairments in her determination.

Ultimately, if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). I posit that the ALJ properly and carefully considered substantial evidence in her decision and that ALJ's finding that Plaintiff was capable of performing light work was supported by substantial evidence.

### H. Conclusion

For the reasons stated above, I suggest that substantial evidence supports the Commissioner's decision, and I therefore **RECOMMEND** that Plaintiff's Motion for

Summary Judgment, (R. 16), be **DENIED**, the Commissioner's Motion for Summary

Judgment, (R. 20), be **GRANTED**, and this case be **AFFIRMED**.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

days after being served with a copy of the recommended disposition, a party may serve and

file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed.

R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections

constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States

v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some

objections, but failing to raise others, will not preserve all the objections a party may have

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d

390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to

be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any

objection must recite precisely the provision of this Report and Recommendation to which

it pertains. Not later than 14 days after service of an objection, the opposing party may file

a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue

raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date: September 23, 2019                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this
date through the Court's CM/ECF system which delivers a copy to all counsel of
record.

Date: September 23, 2019                    By s/Kristen Castaneda
                                            Case Manager